UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WILLIAM L. HUNTRESS, AND | § | |
| ACQUEST DEVELOPMENT, LLC | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| THE UNITED STATES, | § | |
| DEFENDANT. | § | |

## COMPLAINT

Now come William L. Huntress and Acquest Development, LLC, Plaintiffs, by and through their attorneys, LUPKIN PLLC, THE CORNWELL LAW FIRM, and G. ROBERT BLAKEY, seeking damages pursuant to the Federal Tort Claims Act.

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Parties | 2 |
| II. | Nature of Claims and Jurisdiction | 2 |
| III. | Venue | 3 |
| IV. | Scope of the Conspiracy | 4 |
| V. | Conditions Precedent | 5 |
| VI. | The Facts, Part One: Overview | 5 |
| VII. | The Facts, Part Two: Chronology of Events | 11 |
| VIII. | The Facts. Part Three: Avoiding The Rule of Law | 15 |
| IX. | The Constitutional Requirement of Clear Notice | 16 |
| X. | Applying the Constitutional Principles to This Case | 20 |
| XI. | Intent, Part One: Using Vagueness as a Tool | 28 |
| XII. | Intent, Part Two: A Disdain for the Constitution and Supreme Court | 30 |
| XIII. | Intent, Part Three: Additional Facts Showing Maliciousness | 33 |
| XIV. | First Cause of Action – Malicious Prosecution | 42 |
| XV. | Second Cause of Action – Intentional Infliction of Emotional Distress | 43 |
| XVI. | Third Cause of Action: Abuse of Process | 45 |
| XVII. | Conspiracy | 45 |
| XIII. | Damages, and Prayer for Relief | 47 |

I.
<u>PARTIES</u>

1.    Acquest Development, LLC is a New York limited liability company (hereinafter, "Acquest").

2.    Plaintiff William L. Huntress (referred to herein as, "Bill Huntress") is a resident of the Town of Amherst, N.Y. and the President and Sole Managing Member of Acquest.

3.    This Complaint addresses acts committed by employees of federal agencies, including the Environmental Protection Agency ("EPA). However, the only defendant is the United States. No person or governmental agency is named as a Defendant.

II.
<u>NATURE OF CLAIMS, AND JURISDICTION</u>

1.    This Complaint against the United States seeks damages pursuant to the Federal Tort Claims Act (hereinafter, the "FTCA"), 28 U.S.C. § 2671, *et seq.* and 28 U.S.C. § 1346(b)(1). The damages include compensation for economic losses and personal injuries (damages to reputation, emotional distress and mental anguish, humiliation and loss of consortium) caused by the negligent, wrongful and intentional acts and omissions of employees of the United States, while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the State of New York.

2.    Such employees include EPA employees Walter Mugdan, Phyllis Feinmark, Mary Ann Theising, David Pohle, Douglas McKenna, and Murray Lantner, as well as others whose identities are currently unknown and whose conduct will be the subject of formal discovery, as permitted by Fed. R. Civ. Proc. 11(b)(3).

3.      Because this Complaint includes causes of action in the nature of malicious prosecution and abuse of process, Plaintiffs further allege that, with respect to those causes of action, the negligent, wrongful and intentional acts and omissions were committed by "investigative or law enforcement officers" as defined in 28 U.S.C.A. § 2680(h), specifically, Special Agents of the Criminal Investigation Division of the EPA (hereinafter, "CID agents"), including but not limited to Robert Conway, William V. Lometti, David McLeod, Brian Kelly, and Daniel Lau, assigned to the EPA's New York, NY Reporting Office, EPA Region 2, 290 Broadway, New York, NY 10007.

4.      To the extent that other federal agency employees who also participated in causing the malicious prosecution and/or abuse of process were not "investigative or law enforcement officers" as defined in 28 U.S.C.A. § 2680(h), Plaintiffs allege that such employees aided and abetted, conspired with, and acted in concert with "law enforcement agents" in initiating and committing those wrongs, and that their conduct constituted overt acts by conspirators in furtherance of the conspiracy.

III.
VENUE

1.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.A. § 1402(b), in that acts and omissions forming the basis of this Complaint were committed by EPA employees assigned to and working within the EPA's New York City Regional Offices, including acts and omissions by CID agents Robert Conway, William V. Lometti, David McLeod, Brian Kelly, and Daniel Lau, assigned to the EPA's New York Reporting Office, EPA Region 2, 290 Broadway, New York, NY 10007. Such acts include but are not limited to acts and omissions that caused the filing of unfounded felony criminal charges against the

Plaintiffs, maliciously and without probable cause, in two successive criminal cases, *The United States of America v. Acquest Development, LLC and William L. Huntress*, Case Number 1:11-CR-00347, filed in the Western District of New York on November 09, 2011, and *The United States of America v. Acquest Development, LLC and William L. Huntress*, Case Number 1:13-CR-00199, filed in the Western District of New York on September 19, 2013.

## IV.
### SCOPE OF THE CONSPIRACY

1. By this Complaint, Plaintiffs seek damages proximately caused by the filing of felony criminal charges in those two cases. (Those felony charges will hereinafter be referred to as "the indictments.")

2. The indictments against both Bill Huntress and Acquest were subsequently dismissed.

3. Paragraph II.4 is incorporated by reference herein. Further, pursuant to Fed. R. Civ. Proc. 11(b)(3), Plaintiffs allege that the wrongful conduct that forms the basis of this Complaint may have included conduct by employees of the Army Core of Engineers ("ACOE"), as well as attorneys of the U.S. Department of Justice, and/or the United States Attorney's Office for the Western District of New York (collectively, "DOJ"), who knew or should have known of, and/or recklessly disregarded the Constitutional prohibitions that made the indictments of Bill Huntress and Acquest unlawful. If subsequent discovery produces evidence of this fact, then that conduct by ACOE and/or DOJ employees would constitute relevant and admissible evidence of overt acts of co-conspirators who participated in the wrongful conduct at issue herein.

4.    <u>Relevant times</u>. This Complaint involves events that began in 1997, and government acts and omissions in connection with those events that have continued to the present date.

V.
CONDITIONS PRECEDENT

1.    Plaintiffs have fully complied with all conditions precedent in 28 U.S.C. § 2675 of the Federal Tort Claims Act.

2.    This suit has been timely filed, in that Plaintiffs timely served notice of these claims on both The Environmental Protection Agency and The United States Department of Justice on April 3, 2017. Notwithstanding the objectives of 28 U.S.C. § 2675, the EPA and the DOJ have refused to discuss settlement of these claims.

3.    Further, no agency of the government denied the claim in writing or otherwise made any final disposition of the claim within six months after the claim was filed, pursuant to 28 U.S.C. § 2675. Thus, the Plaintiffs (claimants) do hereby deem such inaction to be a denial of the claim, and file this Complaint with the Court as permitted by 28 U.S.C. § 2675(a).

4.    Damages proximately caused by the conduct at issue are capped by 28 U.S.C. § 2675(b) at the amount of $387,629,459.

VI.
THE FACTS, PART ONE: OVERVIEW

1.    The relevant events began in 1997 when Bill Huntress and Acquest bought a small property in Amherst, New York for development. The purchase ultimately led to two civil cases filed by the government in 2009, and two criminal indictments filed in 2011 and 2013. Eight years later (in 2017), one of the two civil cases was dismissed with prejudice on the government's motion. Four and one half years after the first of the two criminal indictments was filed, all

Page 5 of  48

criminal charges against Bill Huntress and Acquest were dismissed. The second of the two civil cases is still ongoing.

2.  This Complaint contains three causes of action: malicious prosecution, intentional infliction of emotional distress, and abuse of process, as well as the law of conspiracy.

3.  All of the claims for relief arise from government efforts to coerce Bill Huntress – initially, via civil complaints seeking millions of dollars in civil penalties – into accepting the EPA's assertion of jurisdiction over his private land, upon the rationale that the land constituted part of "the waters of the United States" within the meaning of the CWA. When that form of coercion proved to be insufficient, the government twice indicted him, both to increase the pressure and punish him for his temerity in refusing to give in to the EPA's demands, and compel acceptance of their assertion of alleged jurisdiction over his private property.

4.  This Complaint seeks damages caused to Huntress by the two indictments. Because the malicious prosecution, conspiracy, intentional infliction of emotional distress, and abuse of process causes of action each require that Plaintiffs establish *intentional* conduct on the part of the government, this Complaint provides substantial factual detail of that intent.

5.  There was no "probable cause" for the criminal charges because the Constitution of the United States requires that charges of criminal conduct may only be based on clear, unambiguous law that proscribes alleged criminal conduct in writing, and in advance of the occurrence of the conduct. As will be described in detail herein, no such law existed prior to or during the time period that the conduct at issue in the indictments occurred. Thus, the conduct alleged in the two indictments was not "a crime," and neither Bill Huntress's nor Acquest's conduct was unlawful.

6.      The *government's* conduct in indicting Bill Huntress and Acquest, however, *was* unlawful. Further, for the reasons described in detail below, the government's agents intentionally committed that wrongful conduct.

7.      In making its decision to indict Bill Huntress and Acquest, the government was not following the objectives of Congress when Congress enacted the CWA. The two indictments of Bill Huntress and Acquest were not a criminal prosecution arising from, or based on, any alleged harm to the environment (and no such harm occurred). Instead, they were criminal prosecutions based on the EPA's notion that the EPA – whether acting properly, or improperly, or even if acting without jurisdiction – must be obeyed. The EPA's objective was to compel such obedience, and to punish Bill Huntress and Acquest for perceived disobedience.

8.      Bill Huntress was born in 1956 in Rochester, New York. When he was 8 years old, his family moved to the Buffalo/Clarence New York area, where – except for the 4 years he served in the United States Air Force, from which he was honorably discharged – he has lived ever since. In May, 1981, he graduated from the University of Buffalo with a Bachelor of Science degree in Business. He first worked as a Certified Public Accountant for Price Waterhouse Coopers (until 1985), and then Realmark Properties (a real estate investment/development firm). In August, 1988, Bill Huntress started his company, Acquest. Bill Huntress is the sole member and manager of Acquest. Over the succeeding years, he built (through Acquest and its related, single purpose entities) beautiful commercial

buildings for a long list of prominent private companies.[1] He also had a long, amicable and profitable relationship with the federal government, building commercial structures to house federal agencies all across the United States.[2]

9.    Bill Huntress and his company were forced out of business at the end of 2011 when the first of the two indictments was procured by the EPA, publicly accusing Bill Huntress and his company of being felons.

10.   By this Complaint, Plaintiffs do not seek to diminish the necessary and proper scope of the jurisdiction granted by Congress to the Executive Branch for the protection of our environment. Bill Huntress, as a husband, a father, and a creator of beautiful buildings, understands and supports the Congressional decision to entrust the EPA with the power to deter those who would otherwise pollute our environment with hazardous wastes.

11.   In the opening section of a previous version of the EPA's own website (now moved to the website archive, at https://archive.epa.gov/epa/aboutepa/epa-history-1970-1985.html), in an article written in 1985 styled, "*EPA History (1970-1985)*"), the EPA states:

_____

[1] Acquest's private clients included Children's Hospital, Kaleida Health System, Millard Fillmore Hospital, Buffalo Cardiology & Pulmonary, Buffalo General Hospital, Dent Neurologic Institute, Moog, Inc., Flower City Printing, The Mentholatum Company, American Packaging, AT&T, Prudential Securities, American Airlines, Headquarters, Inc., Federal Insurance Company, Liberty Mutual Insurance, Schindler Elevator Corporation, Bathfitter, Red Bull North America, Inc., Sodexho America, LLC, Pilkington North America, Inc., Shred - It USA, Inc., Hobart Corporation, and Security Credit Systems.

[2] Acquest's contracts with federal government agencies included the National Labor Relations Board, the United States Attorney, the U.S. Small Business Administration, the Immigration & Naturalization Services, the U.S. Department of Commerce, the U.S. Drug Enforcement Administration, U.S. Bankruptcy Court, U.S. Food & Drug Administration, the U.S. Department of Labor, the U.S.D.A. National Wildlife Research Center, the U.S. Department of Health and Human Services, the U.S. Public Defender, the U.S. General Services Administration, the Social Security/Office of Hearings & Appeals, the Federal Executive Board, the Defense Contract Management Agency, the USGS Ecological Science Center, the U.S.D.A. Animal Plant Health Inspection Service, the U.S. Navy, the Internal Revenue Service, the U.S. Forest Service, the U.S. Department of Veteran's Affairs, the U.S. Customs and Border Protection, the U.S. Treasury Inspector General, the Department of Homeland Security, the U.S. Senator's Office, the Federal Protective Service, the Railroad Retirement Board, the Occupational Safety and Health Administration, the U.S. Department of Transportation, and even the U.S. Environmental Protection Agency (a/k/a, the EPA).

> When the U.S. Environmental Protection Agency [was] formed some fifteen years ago, America had just awakened to the seriousness of its environmental pollution problem. Creation of [the] EPA was part of the response to growing public concern and a grass roots movement to "do something" about the deteriorating conditions of water, air, and land.
>
> For years, raw sewage, industrial and feedlot wastes had been discharged into rivers and lakes without regard for the cumulative effect that made our waters unfit for drinking, swimming, and boating. Smokestack omissions and automobile exhausts made air pollution so bad in certain communities that some people died and many were hospitalized. The land itself was being polluted by indiscriminate dumping of municipal and industrial wastes and some very toxic chemicals that would later come to the fore when their steel drum containers would rust and leak hazardous materials into soil and aquifers.[3]

12.    The undeniable need for the EPA was accurately described in the Congressional Declaration of Goals and Policy in 33 U.S.C.A. § 1251. Therein, Congress listed such objectives as the elimination of discharges of pollutants into navigable waters and the ocean; the development of technology necessary to eliminate such discharges; and the protection of water quality for the propagation and preservation of fish, shellfish, and wildlife. By this Complaint, Plaintiffs do not intend to denigrate the accomplishments of the EPA in addressing those problems. To the contrary, by this Complaint, Plaintiffs seek to hold the EPA accountable for its radical departure from the mission entrusted to it by Congress.

13.    Over the years, the EPA has garnered justifiable public support whenever it stands tall to stop those who threaten to harm what we all recognize as the increasingly fragile environment in which we live, thereby preserving for us and our posterity a country where healthy foods, clean water, and diverse wildlife will abound.

---

[3] Some may even recall the previous year when, on June 22, 1969, the Cuyahoga River in Cleveland, Ohio, was so polluted it caught fire.

14.     Plaintiffs bring this Complaint because the EPA in this case lost sight of its Congressional mandate, and ignored the Constitutional principles that limit its power as an executive branch administrative agency. The EPA's focus on Bill Huntress was not the Congressional focus when Congress created the EPA or enacted the Clean Water Act. Bill Huntress did not dump poisonous chemicals or toxic waste into the ground, much less into "the waters of the United States." Bill Huntress farmed a piece of land that had been farmed for a hundred years, moved some dirt around, brought some fill dirt onto the land, and built an access road onto the land. Nowhere in its multiple civil complaints, or in the criminal indictments that the EPA procured against Bill Huntress and his company, did the EPA ever allege that Bill Huntress had harmed or even threatened to harm the environment.[4]

15.     The EPA's objective was not to secure an indictment of someone who had violated the law, for the EPA had no probable cause to believe that Huntress or Acquest had violated the law. Instead, the totality of the circumstances described herein, the actual government conduct at issue, and the *actual words* of EPA employees responsible for that conduct, evidence an abuse of the EPA's powers in an effort to coerce and punish what the EPA considered to be a recalcitrant landowner who refused to kowtow to the EPA's edicts; a belief by agents of the EPA that the end justifies the means; and a conviction that, above all else, the EPA *must be obeyed*.

---

[4] This case is much like the Vidrine case (*Hubert P. Vidrine, et al v. United States of America*, 2012 WL 253124 (W.D. La. 1/26/2012, no appeal)), as well as others across the United States, in which, even though no harm to the environment occurred or was even threatened, and no actual crime was committed, the EPA brought criminal charges to serve its own administrative interest in increasing its power, and/or merely satisfying the personal interests or egos of one or more of its employees. The government conduct at issue in this case produced only a mindless waste of public and private resources, and senseless harm to a law abiding citizen of our country.

VII.

<u>The Facts Part Two:  Chronology of The Events</u>

1.      In 1997, Acquest bought a 20-acre commercially zoned property on Wehrle Drive in the
Town of Amherst. It was a purchase that began with hope and great expectations for Bill
Huntress. It was a property that should have (and otherwise would have) produced the same
high quality commercial development for the Town of Amherst that Acquest routinely built
for private companies and governmental agencies across the United States.

2.      It was not an investment that Bill Huntress made naively, or out of a lack of experience in
developing commercial property. To the contrary, Bill Huntress purchased the Wehrle land
with a clear understanding of the need (and the investigation necessary) to determine legal
restrictions applicable to such developments, including applicable environmental laws and
regulations. It was, however, a project that did not present – and should have *never come to
involve* – any insurmountable environmental obstacles.

3.      At the time of Acquest's purchase of the Wehrle land, there was an existing ACOE
Nationwide Permit allowing the previous owner to fill .99 acres of an alleged 2.6 acre
"isolated wetland" on the property (a permit that ran with the land). The Wehrle land was
isolated from any traditional navigable waterways, and in 2001, Bill Huntress obtained from
the ACOE a (clearly correct) jurisdictional determination that the Wehrle land contained
only "isolated wetlands" *not subject to regulation* under the Clean Water Act.

4.      In August, 2000 (approximately three years after purchasing the land), Bill Huntress learned
that the property was subject to an *unrecorded* 50-year development moratorium that, years
before, had been required by the EPA as a condition of an EPA monetary grant to the Town
of Amherst for sewer improvements.

5.     The agreement between the EPA and the Town of Amherst was styled "Grant and Moratorium Agreement." It memorialized the EPA's agreement to pay the Town $5.8 million for sewer improvements in exchange for the Town's agreement to prevent certain properties from tapping into portions of the Town's new sewer system.

6.     The property Acquest purchased on Wehrle Drive was subject to the Grant and Moratorium Agreement, but the Agreement had never been properly recorded in the County Clerk's Office, or in the manner required by New York state law in the State Environmental Quality Review Act, so individual property owners (including Bill Huntress) never received notice of the Grant and Moratorium Agreement.

7.     Under the Grant and Moratorium Agreement, the EPA and the Town had arbitrarily, and without any legal justification, labeled the Wehrle land as "environmentally sensitive." The EPA/Amherst agreement thus effected an unconstitutional taking of the Wehrle land without just compensation.

8.     On November 21, 2002, the EPA issued a determination that the Wehrle land constituted a "Special Case" – an unusual and rarely used procedure. The EPA took this step in order to take control away from the ACOE and reverse the ACOE's legally correct determination from the year before (in 2001), that the small isolated spot of "wetlands" was not within ACOE or EPA jurisdiction.

9.      The EPA's "special case" designation violated a 1989 EPA and ACOE Memorandum of

        Agreement that made the ACOE determination binding on the federal government. *United*

        *States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016).[5]

10.     The EPA's "special case" assertion was the first in a series of acts taken by the EPA with the

        apparent objective of showing Bill Huntress that the EPA possessed great power to dictate

        what, if anything, Bill Huntress could do with his private property, and to deter him from

        challenging the EPA's edicts, or its alleged authority to issue them.

11.     Huntress sued the EPA and the ACOE in federal court, claiming that the Wehrle land was

        exempt from wetlands regulation under the CWA. On June 20, 2008, the District Court

        issued a decision dismissing the complaint against the federal defendants for lack of subject

        matter jurisdiction on the ground that the EPA's wetlands designation and the ACOE's

        rescission of plaintiff's provisional work permit did not constitute final agency action within

        the meaning of the Administrative Procedures Act.

12.     In the same suit, Huntress had also sued The Town of Amherst seeking a judgment declaring

        that the 50 year sewer moratorium agreement entered in 1983 between the Town and the

        EPA has resulted in an unconstitutional taking of property without just compensation. The

        federal court also dismissed that claim, holding that the Court lacked jurisdiction because

        the claim was not ripe, since Huntress had not unsuccessfully attempted to obtain just

        compensation through available state procedures. Subsequently, Huntress sued the Town of

        Amherst in state court, and in June of 2016, following a series of appeals from the jury

---

[5] ACOE jurisdictional determinations "are binding for five years on both the Corps and the Environmental Protection Agency, which share authority to enforce the Clean Water Act. See 33 U.S.C. §§ 1319, 1344(s); 33 CFR pt. 331, App. C; EPA, Memorandum of Agreement: Exemptions Under Section 404(F) of the Clean Water Act § VI-A (1989)."

verdict in that case, the Town of Amherst paid Acquest $3.94 million for illegally terminating Acquest's office-park project planned for the Wehrle land.

13. But Huntress still could not move forward with the development of the Wehrle land, because Huntress's problems with the EPA continued. And what began with the Wehrle land in August, 2000, continued when Huntress purchased a 97-acre farm on Transit Road in Amherst in 2006 (hereinafter referred to as the "Transit Road land").

14. Ultimately, in 2009, the EPA sued Bill Huntress and Acquest in two civil cases, alleging Clean Water Act violations at both the Wehrle and Transit Road sites.

15. When the threat of the massive civil penalties that the EPA sought in those two cases did not achieve sufficient coercive effect, in 2011 and 2013 the EPA procured not one, but two criminal indictments of Bill Huntress and Acquest.

16. As will be described in greater detail below, the two indictments – which were procured in substantial part at the urging of Walter Mugdan, a senior official in the EPA's New York Office – were both defective. The first was dismissed by the Court due to prosecutorial misconduct committed during the grand jury proceedings; and both the first and second indictments rested on conduct that was *not prohibited conduct under the law* because *the EPA had no jurisdiction* over the Transit Road land. All charges against Huntress and Acquest were finally dismissed in 2016.

17. On September 25, 2017, the government filed a motion to dismiss the Wehrle civil case with prejudice; and on November 1, 2017, the Court granted the motion. The Transit Road civil case is still ongoing.

VIII.
<u>THE FACTS. PART THREE: AVOIDING THE RULE OF LAW</u>

1.      At its heart, this Complaint involves two fundamental concepts on which our country, and

our Constitution, rest. The first is the due process principle that the lives, freedoms and

property of the citizens of this country cannot be taken away at the whim of those who hold

government power. Such governmental takings are only permitted for clear wrongdoing

which is proscribed in unambiguous, understandable, written terms before the conduct

occurs.

2.      The second concept is that of separation of powers. Recognizing that power corrupts, our

forefathers acted to create a government devoid of general, undefined, amorphous powers,

whereby each branch and each entity within each branch of the government might determine

the scope of its own power.[6] Under our system, those who are entrusted with the power to

run federal agencies may not determine the scope of their own powers – the jurisdiction of

federal agencies is determined solely by Congress (as construed, of course, by the federal

courts, if necessary and if possible, when a statute is unclear).

3.      Our country is based on the rule of law, as contrasted with totalitarian regimes around the

world that tolerate "the rule of men." Our adherence to due process and a separation of

---

[6] Credit for the phrase "Power tends to corrupt, and absolute power corrupts absolutely," is often given to John Dalberg-Acton (a/k/a, The Right Honourable The Lord Acton), as contained in his letter to Bishop Mandell Creighton, April 5, 1887. (See, Historical Essays and Studies, edited by J. N. Figgis and R. V. Laurence, London: Macmillan, 1907.) However, the basic concept was clearly part of the much earlier thinking of our country's founding fathers. *See, e.g.*, Jay, John; Hamilton, Alexander; Madison, James. *The Federalist Papers*. Unique Classics. Kindle Edition at 809-810. ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time.") See also, *The Structure of the Government Must Furnish the Proper Checks and Balances Between the Different Departments* – Alexander Hamilton or James Madison, February 8, 1788. The Federalist Papers. Unique Classics. Kindle Edition at 4591.

powers thus preserves the "freedom" that we are perhaps most proud of the United States – the freedom from fear of our own government.

4.     By this Complaint, Plaintiffs seek damages caused by the EPA's rejection of those principles; its efforts to define its own jurisdiction; and its determination to exercise its great power at its whim over privately owned land and upon those who own the land.

5.     In this case, the EPA took those actions even *after it had attempted and failed* to convince the United States Supreme Court that Congress (via the CWA) had given it jurisdiction over land like that owned by Bill Huntress.

6.     The EPA thereby rejected the rule of law, and assumed the role of a despot.

> When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. * * * [T]he fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, *so that . . . the government . . . 'may be a government of laws and not of men.'* For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369-370 (1886)(emphasis added).

IX.

THE CONSTITUTIONAL REQUIREMENT OF CLEAR NOTICE

1.     Our Constitution prohibits the government from charging a citizen of the United States with committing "a crime" that is *not clearly defined by law* as "a crime" *prior to the time* the

Page 16 of  48

conduct at issue occurred. Constitution of the United States, Article I, section 9, and Fifth and Fourteenth Amendments.[7]

2.     This is commonly referred to as the "void for vagueness" doctrine. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Clearly defined means that a statute (on its face, or as it has been construed by federal courts) must "define the criminal offense with sufficient definiteness that *ordinary people* can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)(emphasis added).

3.     This principle was summarized by the Supreme Court in *U.S. v. Lanier*, 520 U.S. 259 (1997), in this way:

> There are three related manifestations of the fair warning requirement. *First,* the vagueness doctrine *bars enforcement of "a statute which either forbids or requires* the doing of an act in terms so vague that *men of common intelligence must necessarily guess at its meaning and differ as to its application*." * * * *Second*, as a sort of "junior version of the vagueness doctrine," H. Packer, The Limits of the Criminal Sanction 95 (1968), *the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.* * * * *Third,* although clarity at the requisite level may be supplied by judicial gloss on an *otherwise uncertain statute, . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its*

_____

[7] *See, also, Calder v. Bull 3 Dall. 386*, 389-90 (1798); *Frank v. Mangum*, 237 U.S. 309, 344 (1915); *United States v. Harriss*, 347 U.S. 612, 617 (1954)("The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."); *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).

scope. * * * In each of these guises, *the touchstone is whether the statute, either standing alone or as construed*, made it reasonably *clear at the relevant time* that the defendant's conduct was criminal.

520 U.S. at 266-267 (Emphasis added. Internal citations omitted.)

*See also*, *U.S. v. Santos*, 553 U.S. 507 (2008), wherein the Court affirmed the dismissal of the defendant's criminal conviction because there were two equally plausible interpretations of a criminal statute, stating, "Under a long line of our decisions, *the tie must go to the defendant*. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."

4.    In *FCC v. Fox Television Stations, Inc*, 567 U.S. 239 (2012), the Supreme Court provided a brief history of the Court's recognition of these fundamental principles:

> A fundamental principle in our legal system is that laws which regulate persons or entities must **give fair notice of conduct that is** forbidden or **required.** *See Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("**[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess** at its meaning **and differ** as to its application, violates the first essential of due process of law"); *Papachristou v. Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("**Living under a rule of law** entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids'" (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (alteration in original))). This **requirement of clarity in regulation** is essential to the protections provided by the Due Process Clause of the Fifth Amendment. *See United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). It requires the invalidation of laws that are impermissibly vague. A conviction or **punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.**" Ibid. As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved. *See id.* at 306, 128 S.Ct. 1830. (Emphasis added.)

567 U.S. at 253 (emphasis added)

5.      Finally, federal agencies, just like federal courts, must have *jurisdiction* in order to exercise

their delegated powers – jurisdiction granted by the Constitution, or the legislature.[8]

6.      A helpful summary as to this last principle was recently provided by Circuit Judge Newman

in his dissenting opinion in *Return Mail, Inc. v. United States Postal Service*, 868 F.3d 1350,

at 1371-1372 (Fed. Cir. 2017):

> This court has an independent obligation to ascertain its own jurisdiction and
> that of the tribunal below. *See Mitchell v. Maurer*, 293 U.S. 237, 244, 55
> S.Ct. 162, 79 L.Ed. 338 (1934) ("An appellate federal court must satisfy itself
> not only of its own jurisdiction, but also that of the lower courts in a cause
> under review."). Although the foregoing concerns a court's review of a lower
> court's jurisdiction, *the same principle applies to review of an agency's
> jurisdiction. See, e.g., Da Cruz v. INS*, 4 F.3d 721, 722 (9th Cir. 1993)
> (considering, *sua sponte*, whether the BIA lacked jurisdiction). This inquiry
> cannot be waived. It is a "judicial function," and not that of an agency, to
> decide the limits of the agency's statutory powers. *Social Sec. Bd. v.
> Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946).
>
> "An agency is but a creature of statute. Any and all authority pursuant to
> which an agency may act ultimately must be grounded in an express grant
> from Congress." *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed.
> Cir. 1993). *See also Sealed Air Corp. v. United States Int'l Trade Comm'n*,
> 645 F.2d 976, 993 (CCPA 1981) ("Any authority delegated or granted to an
> administrative agency is necessarily limited to the terms of the delegating
> statute."); *Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1117 (6th Cir. 1984)
> (administrative agencies are vested only with the authority given to them by
> Congress); *Atchison, Topeka & Santa Fe Ry. Co. v. Interstate Commerce
> Comm'n*, 607 F.2d 1199, 1203 (7th Cir. 1979) (same).

7.      Given the requirements of both *fair notice* and actual *jurisdiction*, it is clearly unlawful for

an agency to cause someone to be indicted for violating its regulations when the law is so

unclear that *no one can know* whether the agency even has jurisdiction over the person or

---

[8] *See, e.g., U.S. v Hudson and Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1820)(Congress must specify the crime, and the punishment, and designate a court with jurisdiction); and *US v Bevans*, 16 U.S. (3 Wheat) 336 (1818)(Marshall J.)(a murder in the Boston Harbor not prosecutable even though within the general jurisdiction of the United States because Congress had not designated a Court to try it).

his property, *i.e.*, whether *the statute* the agency purports to be enforcing *even applies* to the property and/or conduct at issue.

### X.
### APPLYING THE CONSTITUTIONAL PRINCIPLES TO THIS CASE

1.   The application of these Constitutional principles to the facts of this case is simple, easy and clear. This Court need not rely on Bill Huntress's assertion of lack of clear notice.

2.   Both of the indictments at issue were premised on acts and omissions that were allegedly illegal solely because of the EPA's alleged jurisdiction over the Transit Road land. Therefore, the allegedly wrongful acts and omissions could only have been unlawful if the EPA *actually had jurisdiction* over the Transit Road land – *i.e.,* it was necessary that the CWA clearly applied to land *such as the Transit Road land*.

3.   The CWA statute, on its face, applies only to "navigable waters," which the statute defines as "the waters of the United States." Thus, for the government to have lawfully indicted Bill Huntress and Acquest, it was constitutionally required that the Transit Road land, as a matter of law, was clearly part of "the waters of the United States."

4.   In enacting the CWA, Congress first described the statute as covering the country's "navigable waters," but then defined "navigable waters" as "the waters of the United States."

5.   The application of the CWA to certain bodies of water (like the Niagra River) has been clear, and without dispute. The Supreme Court also has determined that certain "wetlands" are part of "the waters of the United States."

6.   The Supreme Court has determined that other bodies of water (such as isolated ponds) are not covered by the CWA because they are not part of "the waters of the United States." (*See,*

*e.g., Solid Waste Agency of Northern Cook CTY. v. Army Corps of Engineers*, 531 U.S. 159, 173 (2001))

7.  However, at no point in time, prior to or during the conduct at issue in the two indictments (2005-2010), or even since then, has the Supreme Court ever been able to determine whether lands like the Transit Road land are part of "the waters of the United States." More specifically, *due to the vagueness of the CWA, the Supreme Court has tried, but been unable to* determine whether land like the Transit land constitutes a "water of the United States."

8.  The Transit Road land looks much like the many other farm lands in the area. It has no standing surface water except for one small pond that contains rain water, and puddles that last for a few days after a heavy rain, or in the spring during snow melt when the ground is still frozen.

9.  During the years Bill Huntress owned the land, crops were grown on the land.

10.  During 2005-2010, the law *was clear* that *not all* wetlands are "jurisdictional wetlands," *i.e.*, not all wetlands are part of "the waters of the United States."

11.  For land such as the Transit Road land to be part of "the waters of the United States," the first requirement is that the land be a "wetland," and both indictments thus contained allegations to that effect.

12.  In its first indictment, the government alleged that the Transit Road land was "wetlands."

13.  In its second indictment, the government repeatedly referred to the Transit Road land as containing *"potential wetlands." That* new phrasing was at least a tacit admission that even the first requirement of the criminal charge was, in this case, unclear. *That ambiguity alone* made the indictment unlawful.

14. But the ambiguities only begin with that first basic requirement that the Transit Road land be a "wetland." The scope of the ambiguities and uncertainties explodes with the larger and ultimate issue of whether the land is a "jurisdictional wetland," *i.e.* is part of "the waters of the U.S."

15. As to that issue, not even the United States Supreme Court, when it considered the issue, was able to determine whether land such as the Transit Road land was part of "the waters of the United States," and thus, whether or not the CWA applies to such land.

16. The allegedly wrongful conduct, as specified in the two indictments, occurred between June of 2005 and May 25, 2010. During that time period, the controlling Supreme Court jurisprudence on this issue was *Rapanos v. U.S.*, 547 U.S. 715 (2006).

17. At issue in *Rapanos* were alleged wetlands that are located remotely from traditional navigable waters, that only lie *near* ditches (such as the roadside ditch that lies outside of and runs parallel to the west end of the Transit Road land); that are *not adjacent to* any navigable water (such as the Niagra River); that *do not abut* any navigable water; and that contain no permanent, standing or continuously flowing body of water, such as a stream, ocean, river, or lake, but only an isolated pond, or puddles of water lasting for a few days after a big rain or while snow is melting in the early spring, and rain water ditches through which water flows intermittently or ephemerally, providing drainage for rainfall.

18. Also at issue in *Rapanos*, as identified in the opinions of at least some of the Justices, was the importance, if any, of "boundary-drawing" clarity. As described by Justice Scalia, that issue exists whenever (as with the Transit Road land) the alleged wetlands are located near a roadside ditch which might be part of "the waters of the United States," and any surface

water covering the "wetlands" does (or does not) create difficulty in determining the boundary between the wetlands and the nearby "waters of the United States." Some of the Justices in *Rapanos* believed that when there is no "boundary-drawing problem" caused by a continuous surface water connection with a water body that is part of "the waters of the United States" in its own right, such a wetland is not part of "the waters of the Unites States." Other justices disagreed.

19. The characteristics of the land at issue in *Rapanos* are the characteristics of the Transit Road land.

20. When the Supreme Court in *Rapanos* attempted to answer the question of whether such wetlands (or *potential* wetlands) are part of "the waters of the United States," the Court *was not able to answer the question*. The *Rapanos* opinion was 63 pages long (547 U.S. at 749 to 812), and contained five (5) quite distinct and differing sets of views on this issue, one opinion by Justices Scalia, Roberts, Thomas, and Alito, a second concurring opinion by Chief Justice Roberts, a third opinion (concurring *only* in the judgment) by Justice Kennedy, a fourth opinion by Justice Stevens (in which Souter, Ginsburg and Breyer joined, dissenting), and a fifth opinion by Justice Breyer. There was no majority opinion, and thus *no decision – no answer* by the Court to the critical question.

21. Left undecided, and thus unclear as a matter of law, was even which factor, or factors, discussed in the various opinions of the various Justices, individually, or in combination, were material, much less which factors were critical, in determining whether alleged wetlands of the general nature at issue might be part of "the waters of the United States."

22.     Not only was the applicability of the CWA to such land indisputably unclear after the

*Rapanos* decision was issued in 2006, it has remained unclear to date, because Congress has

enacted no amendments clarifying the CWA, and neither the EPA nor the ACOE has

promulgated any lawfully enacted, new, final administrative rule of law (C.F.R. provision)

removing the ambiguity.[9]

23.     There had been no clarification even by the time of Justice Alito's *reminder* of the

"notorious" lack of clarity in the CWA in the *Sackett* case in 2012:

> "The reach of the Clean Water Act is notoriously unclear. Any piece
> of land that is wet at least part of the year is in danger of being
> classified by EPA employees as wetlands covered by the Act, and
> according to the Federal Government, if property owners begin to
> construct a home on a lot that the agency thinks possesses the
> requisite wetness, the property owners are at the agency's mercy. The
> EPA may issue a compliance order demanding that the owners cease
> construction, engage in expensive remedial measures, and abandon
> any use of the property. If the owners do not do the EPA's bidding,
> they may be fined up to $75,000 per day ($37,500 for violating the
> Act and another $37,500 for violating the compliance order)."

 *Sackett v. E.P.A.*, 566 U.S. 120, 132 (2012)

Nor has there been any clarification since the date of those comments.

24.     That is what this case is all about. Bill Huntress spent years and millions of dollars in legal

fees resisting the EPA's assertions of jurisdiction over his land because the law – including

both the CWA statute itself, and the duly promulgated EPA regulations – was indecipherably

---

[9] A "lawfully promulgated" regulation, often called a "legislative rule" must be within the scope of the rule-making authority conferred on the agency by Congress, **and** must be enacted in compliance with the procedures prescribed by the APA. *Sweet v. Sheahan*, 235 F.3d 80 (2nd Cir. 2000). The EPA did not issue any such new rule "defining waters of the U.S." between the date of the *Rapanos* decision, and May, 2010, which was the last date of any allegedly "illegal" conduct by Bill Huntress.

vague and ambiguous. Bill Huntress simply could not know – nor, for that matter, could the EPA know – whether or not the CWA applied to his land.

25.     The EPA not only punished Bill Huntress for what he could not know, it did so under the guise of having jurisdiction over his property *after it had argued its interpretation of its jurisdiction to the Supreme Court, and the Supreme Court had declined to adopt* the EPA's interpretation.

26.     Not once, but twice, the EPA procured indictments of Bill Huntress and his company based on the EPA and ACOE's "interpretation" that the CWA applied to land like the Transit Road land – the very interpretation of the CWA that the Solicitor General (on behalf of EPA and ACOE) had presented to (and been rejected by) the Supreme Court in *Rapanos*, namely, that the CWA gives those agencies *jurisdiction* over land like the Transit land because such land constitutes a "water of the United States."

27.     Throughout *Rapanos*, the Supreme Court discussed whether it could grant "deference" to that interpretation. The Court's consideration of such deference appears repeatedly throughout the plurality, concurring and dissenting opinions in *Rapanos*. (547 U.S. at 749, 752, 756, 758, 766, 778, 799, 803, 805, 809, 810, 811.)

28.     As indicated by the Supreme Court's extensive consideration of the deference issue, the Court had before it all of the EPA's interpretations, regulations and opinions regarding the scope of the EPA's *perceived* jurisdiction. In the end, the Supreme Court declined to grant deference to the agencies' interpretation.

29.     And what did the government do after the *Rapanos* Court found that the CWA was too vague to grant deference to the agencies' interpretation? It simply ignored the *Rapanos* decision, and used the agencies' interpretation to get Bill Huntress indicted – and not once, but twice.

30.     The EPA ignored the Constitution, thumbed its nose at the Supreme Court, and sent Bill Huntress a message (in the form of an indictment): "Leave it to the EPA to determine what the law is; it is none of *your* – or for that matter, the Supreme Court's – business."

31.     In the context of that government conduct, the changes in the wording of the second of the two indictments is revealing. First, as noted above, there was the change from an allegation of "wetlands" to "*potential* wetlands."

32.     In addition, the first indictment contained two "Clean Water Act" counts, Counts 6 and 7, both styled "Unpermitted filling of Wetlands," and both citing to *Title 33*, (specifically, 33 U.S.C. §§ 1319(c)(2)(A) and 1311(a)). In the second indictment, those Title 33 Counts were eliminated.

33.     Both the changes from wetlands to *potential* wetlands, as well as the deletion of those Title 33 Counts, suggest an effort by the government to cleverly avoid the issue of the "notoriously unclear" provisions of the Clean Water Act. But the effort was ineffective, since *all* of the counts in both indictments arose out of alleged requirements (legal obligations) under *the Clean Water Act*.[10] In fact, both indictments specifically alleged that not only the

----

[10] Count I in both indictments asserted a conspiracy involving efforts "[t]o defraud the United States, that is, to hamper, hinder, impede, impair, and obstruct by craft, trickery, deceit, and dishonest means, *the lawful and legitimate functions of the EPA and the Corps in enforcing federal environmental laws and regulations.* Similarly, Count 2 of both indictments charged a violation of 18 U.S.C. 1519 based on an alleged "intent to impede, obstruct, and influence the investigation and proper administration of a determination by the U.S. Environmental Protection Agency (EPA) as to the applicability of the Clean Water Act to the Site." The same fatal defect was present for the charges under 18 U.S.C. § 1001 in Counts 3 and 4 of both indictments, which rested on alleged false statements made to the EPA regarding a "wetlands determination" and use of the land for agricultural purposes. Thus, the

(continued...)

Title 33 Counts, but also the Title 18 charges rested on numerous provisions of the Clean Water Act. *See, e.g.*, Second indictment, ¶'s 4-10 at pages 2-4, under the heading, <u>Authority of the Environmental Protection Agency over the Clean Water Act</u>.

34.    The Constitutional issue in the context of those indictments is not whether the EPA "had jurisdiction" over land like the Transit Road land, but whether the law *prior to and during* the time of the alleged wrongful conduct *clearly provided* that the EPA had jurisdiction. If it was *not clear* that the EPA, via the CWA, had *actual authority* over the Transit Road land, then it was equally *not clear* that Bill Huntress's *conduct* was illegal.

35.    As the Supreme Court noted in *FCC v. Fox Television Stations, Inc*., *supra*, "punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide *a person of ordinary intelligence* fair notice of what is prohibited." Since not even men and women of extraordinary intelligence (the Justices of the United States Supreme Court) could determine whether land such as the Transit Road land was part of "the waters of the United States," *ipso facto*, persons of ordinary intelligence had no fair notice.

36.    What *was clear* when the government indicted Bill Huntress and his company is that the indictments were unlawful.

---

[10](...continued)
elimination in the second indictment of the two Title 33 (Clean Water Act) charges failed to cure the jurisdictional defect. All of the felony charges in both indictments rested on alleged jurisdiction of the EPA over the Transit Road land, jurisdiction which simply did not exist under the CWA in any clear, unambiguous manner, as constitutionally required to support the felony charges in the indictment.

XI.
<u>INTENT, PART ONE: USING VAGUENESS AS A TOOL</u>

1.     The EPA's efforts to sanction Bill Huntress for not kowtowing to the edicts it issued to him

were *deliberately* lawless, because those edicts rested on EPA assertions of "jurisdiction"

over him and his land which the Supreme Court had refused to accept.

2.     The use and abuse of such vagueness is a tool that EPA has come to rely on in its

"enforcement" activities – a pattern of *choosing vagueness* over "fair notice" in its own

regulations.

3.     One example illustrating the point is the latest definition of "the waters of the United States"

promulgated by the EPA in 2015 and published as 33 C.F.R. § 328.3 and 40 C.F.R. § 230.3

(identical language), a *definition* which is 2,218 words long, and is a model of

unconstitutional vagueness and incomprehensible ambiguity. Therein, the EPA even

unabashedly proclaims that "the term waters of the United States" means "All waters in

paragraphs (a)(7)(I) through (v) of this section where they are *determined, on a case-specific*

*basis*, to have *a significant nexus* to a water identified in paragraphs (a)(1) through (3) of this

section. The waters identified in each of paragraphs (a)(7)(I) through (v) of this section are

similarly situated and shall be combined, for purposes of a significant nexus *analysis*."

4.     Within § 328.3 (at § 328.3(c)(5)) there is also another similarly vague definition, a definition

of "significant nexus." No one – at least no citizen in our country – should be forced to risk

a prison term on his guess as to how the EPA might interpret and apply the words *significant*

*nexus* in any given case.

5.     The EPA's long standing practice of employing such ambiguity in its rule making process

evidences a deliberate choice – an intent to prevent *mere citizens* from being able *to know*

what "the law" requires, and thereby preserve the EPA's flexibility to punish those who refuse to accept its unilateral interpretations of the law by subjecting the recalcitrants to millions of dollars in fines, and even criminal indictment.

6.     This kind of government conduct is not at all uncommon where the rule of law does not exist. The EPA says the ambiguity means one thing; the landowner says it means another. And the EPA wins the argument for the simple reason that most landowners do not have the resources to fight; and those who do will be indicted if they persist in not *allowing* the EPA to win. That is what happened to Bill Huntress.

7.     When the law is unclear, there is, in effect, no law; and "the rule of men" fills the void. That is what Bill Huntress faced in this case.

8.     By perpetuating vagueness, and eschewing fair notice, the EPA preserves its ability to wield its massive resources at will, "on a case by case basis." By *citing its interpretations in justification of* its edicts, the EPA performs a clever slight-of-hand. It is a *facade*; it is the rule of men masquerading as the rule of law:  the law is what the EPA says it is.

9.     The EPA's historical use of vagueness to achieve its objectives has now been officially renounced by the executive branch of our government. The President, and the heads of the EPA and ACOE have now publicly denounced the "rule of men" within the EPA and ACOE, and ordered it to stop in the Executive Order of February 28, 2017, titled "Restoring the Rule of Law." It was then confirmed by the EPA and ACOE in their March 6, 2017 Federal Register Notice, wherein both agencies explicitly recognized that, "It is important that stakeholders and the public at large have certainty as to how the CWA applies to their

activities." Whether that newly proclaimed official *policy* will become actual EPA *practice*, or how long it may take if it does, remains unclear. [11]

XII.

<u>INTENT, PART TWO: A DISDAIN FOR THE CONSTITUTION AND SUPREME COURT</u>

1. We briefly discussed above the concerns that led our founding fathers to create a separation of federal government powers in order to prevent the abuse of power.

2. The indictment of Bill Huntress and his company that occurred in this case represents the kind of abuse of power by despotic monarchs that our founding fathers sought to exclude from government in our country. Both those events *and the words* of the EPA's senior management suggest a disdain within the EPA for those Constitutional principles.

3. This disdain was openly expressed by the EPA's former Regional Counsel for EPA Region 2, now the EPA's Director of the Emergency and Remedial Response Division, Walter Mugdan, of the EPA's regional office in New York City.

4. At a conference held in New York City on July 27, 2007, involving Bill Huntress, two of his corporate officers, and representatives of the EPA, the EPA said it would only allow Huntress to develop some of the Wehrle land if they paid $2,000,000 to the government, and that *otherwise* they would have to pay $400,000 and could never develop the Wehrle property. In response, the General Counsel of Acquest Wehrle stated that he did not believe the EPA could demonstrate that it had any jurisdiction over the Wehrle land under the Clean Water Act. Mr. Mugdan became very agitated, and making reference to the Supreme Court

---

[11]     Long standing EPA practices tend to persist, as illustrated by the EPA's refusal *to even discuss* a possible settlement of this case after these claims were administratively filed in early April of this year, notwithstanding the clear Congressional objective or promoting early, informal resolution of federal tort claims by requiring that, as a condition precedent to filing a lawsuit, an Administrative Claim be filed. (See ¶ V.2, pg. 4 above.)

Page 30 of  48

decision in *Rapanos v. U.S.*, 547 U.S. 715 (2006), in which Chief Justice Roberts joined the opinion of Justice Scalia and wrote a separate opinion of his own criticizing ACOE's and EPA's essentially boundless views of the scope of their powers, Mr. Mugdan then asserted, "Let the Chief Justice try to enforce it!"

5.  Mr. Mugdan's view that the EPA *makes its own* law – notwithstanding our constitutional system to the contrary – illustrates and explains the EPA's overall conduct toward Bill Huntress and Acquest in this case, from the initial confrontations over the Wehrle land; through its malicious criminal prosecution of Bill Huntress and Acquest; and continuing thereafter in the Transit Road civil litigation.

6.  What Mr. Mugdan said cannot be simply excused or discarded as an aberrant remark by an isolated EPA malcontent. Mugdan held a high level position in the EPA, and it was Mugdan who referred Huntress's challenge of the EPA's assertions of jurisdiction over his property to the Criminal Investigative Division (CID) for indictment.

7.  Given the EPA's proven addiction to vagueness in its own rulemaking, it is probable that Mugdan was expressing a widely held sentiment within the EPA.

8.  What happened to Bill Huntress should not happen to any citizen in our country. Further, it is unlikely that such an indictment of a prominent law-abiding citizen could have been procured through the efforts of only one or two EPA employees, secretly, in a vacuum.

9.  Thus, Plaintiffs allege pursuant to Fed. R. Civ. Proc. 11(b)(3) that it is probable that evidence will be developed after a reasonable opportunity for further investigation and discovery, showing that those indictments were procured with the assistance and complicity of a

number of EPA employees who, without objection, acquiesced in, and thereby assisted in procuring the indictments.

10.     Thus, Plaintiffs allege as permitted by Fed. R. Civ. Proc. 11(b)(3), that discovery will likely produce evidence that Mudgan's disdain for our constitutional system of law – just as the EPA's deliberate use of vague regulations – represents a widely held ethic within the EPA.

11.     Plaintiffs further allege, as permitted by Fed.R.Civ.Proc 11(b)(3), that discovery will likely produce evidence that this ethos of lawlessness made those who procured the indictments of Bill Huntress feel comfortable with what they did, *in tune* with and encouraged by a management policy of turning a blind eye to constitutional, congressional and judicial constraints, and leaving its agents free to "make examples" of anyone who, like Bill Huntress, might challenge the EPA's "interpretations" of the scope of its power.

12.     Walter Mugdan's views also exude an arrogance, a cavalier attitude, and a malicious indifference to the rights of Bill Huntress, all of which are beyond inappropriate in a matter as serious as a referral for criminal indictment. Mr. Mugdan readily admitted in his deposition in the Transit civil case that he had referred the Huntress case to the CID Division for criminal prosecution, stating, "I advised members of my team that we should bring this matter to the attention of the criminal investigation division." Yet, when pressed on *the reasons* for that criminal referral he cavalierly stated, "I am not an expert in criminal law or criminal environmental law;" and multiple times during his deposition also stated he was not an expert on the Clean Water Act, or the wetlands portion of the Clean Water Act.

13.    While there are, undoubtedly, law abiding people working for the EPA, the deliberately lawless conduct that produced the indictments of Bill Huntress reflects that the EPA lost its focus, and became a run-away train – in this case, a train that jumped its track.

XIII.
INTENT, PART THREE: ADDITIONAL FACTS SHOWING MALICIOUSNESS

The *Rapanos* Decision was Not a Secret

1.    Given the significance to the EPA of the Supreme Court's inability in *Rapanos* to give deference to EPA's interpretation that the CWA applied to land such as the Transit Road land, there is no doubt that those within the EPA who procured the indictments of Bill Huntress and Acquest knew of the *Rapanos* case. (Walter Mudgan, as noted above, even referenced it as bearing – to his dislike – on the Huntress case.)

2.    In short, the EPA knew that *the law* upon which those indictments rested was unconstitutionally vague and ambiguous, and that the indictment of Bill Huntress was therefore unlawful. The deliberate decision to ignore that knowledge, *alone* establishes a wilful and malicious intent in bringing those indictments. But there is more.

The Length of the EPA's Campaign Evidences Malicious Intent

3.    The number of years dedicated by the EPA to the Wehrle and Transit Road civil cases – without even an allegation of harm to the environment – demonstrates the EPA's malicious intentions toward Bill Huntress and his companies. It was an obsessive quest for punishment, bearing no reasonable relationship to any concerns for the environment – a campaign that started with claims for millions of dollars in civil penalties; by the end of 2017 had cost Huntress millions of dollars in legal and expert witness fees; included two indictments, both

ultimately dismissed; and is not over yet, for the second of the two civil lawsuits is still ongoing.

4.    It appears that the EPA's campaign consumed the American public's taxpayer dollars in an amount at least as large as what Bill Huntress spent, as evidenced in part by the very large number of EPA employees who participated in the campaign.

5.    For the EPA to cause such a huge waste of time and resources without even an allegation of harm to the environment, is so outrageous that it lacks any credible explanation other than as being a product of maliciousness.

6.    Further, and once again, it is not just the EPA's *conduct* that reflects the EPA's malicious intent; that intent was openly expressed by another high level EPA manager, Phyllis Feinmark, the Branch Chief, Water and General Law Branch, Office of Regional Counsel for EPA in New York City, when, in January 2005, she stated to Acquest's General Counsel, Louis Fessard, "The government does not care about money or time; Bill Huntress does."

7.    Obviously, the EPA considers the *deliberate waste* of a targeted victim's money and time to be a *legitimate weapon* to coerce obedience – a tactic easily used, no matter what it costs the taxpayers. The creation of such waste is just another "tool in the EPA's toolbox."

### The EPA's View of Its Right to Freedom from Interference or Restraints

8.    The EPA's maliciousness is also evidenced by the EPA's routine resistance to any questioning of its powers (*i.e.*, its asserted jurisdiction) – even questioning by the federal judiciary of the EPA's perceived *right* to apply *its own interpretations* of the CWA, as well as the regulations it adopts related to the CWA.

9.    In *Sackett v. E.P.A.*, 566 U.S. 120 (2012), for example, the EPA actually asserted that,

because "Congress gave the EPA the choice between a judicial proceeding and an

administrative action, it would undermine the Act to allow judicial review" of the EPA's

administrative actions. In other words, the EPA actually claimed that it was *solely within the*

*discretion of the EPA to determine* if (or when) a federal court was permitted to determine

whether the EPA even had jurisdiction to issue administrative orders and otherwise take

control of private property.

10.   The Supreme Court unanimously rejected the EPA's assertion of such absolute power,

stating in part that there was "no reason to think that the Clean Water Act was uniquely

designed to enable *the strong-arming of regulated parties* into 'voluntary compliance'

without the opportunity for judicial review – *even judicial review of the question whether*

*the regulated party is within the EPA's jurisdiction*." *Id.* at 130-131 (emphasis added).

11.   Here is more of what Justice Alito had to say:

> *The position taken in this case by the Federal Government* – a position that
> the Court now squarely rejects – *would have put the property rights of*
> *ordinary Americans entirely at the mercy of Environmental Protection*
> *Agency (EPA) employees.*
>
> *The reach of the Clean Water Act is notoriously unclear.* Any piece of land
> that is wet at least part of the year is in danger of being classified by EPA
> employees as wetlands covered by the Act, and according to the Federal
> Government, if property owners begin to construct a home on a lot that the
> agency thinks possesses the requisite wetness, the property owners are at the
> agency's mercy. The EPA may issue a compliance order demanding that the
> owners cease construction, engage in expensive remedial measures, and
> abandon any use of the property. *If the owners do not do the EPA's bidding,*
> they may be fined up to $75,000 per day ($37,500 for violating the Act and
> another $37,500 for violating the compliance order). And if the owners want
> their day in court to show that their lot does not include covered wetlands,
> well, as a practical matter, that is just too bad. Until the EPA sues them, they
> are blocked from access to the courts, and the EPA may wait as long as it

Page 35 of  48

>wants before deciding to sue. By that time, the potential fines may easily
>have reached the millions. In a nation that values due process, not to mention
>private property, such treatment is unthinkable. (*Id.*, emphasis added.)

12.     Justice Kennedy, in a concurring opinion in *U.S. Army Corps of Engineers v. Hawkes Co.,*

*Inc.*, 136 S.Ct. 1807, 1817 (2016), similarly noted that the Clean Water Act "continues to

raise troubling questions regarding the Government's power to cast doubt on the full use and

enjoyment of private property throughout the Nation."

13.     Those criticisms of the EPA's views of what the EPA considers to be its unfettered powers

lie at the heart of this case: a regulatory agency infected by the notion that it has absolute

power; the right to exercise that power in *its* sole discretion; and a willingness to abuse that

power *as a means* to dissuade anyone, especially private citizens, from challenging the scope

of its powers.

14.     This Complaint focuses on EPA conduct that was even worse than the conduct at issue in

*Sackett*; this case involves not merely the threat of devastating civil fines to deter challenges

to its jurisdiction, but an effort to impose criminal penalties including incarceration in a

federal penitentiary to achieve that objective. Here, the EPA maliciously caused criminal

felony charges to be filed against Bill Huntress and his company – and just as in *Sackett* –

without concern for whether or not the EPA *actually had jurisdiction* over his land.

### The EPA's Determined Efforts to Quiet Its Challengers

15.     When Bill Huntress did not do the EPA's bidding, and the threat of millions of dollars in

civil fines did not deter his willingness to continue his challenge of the EPA's edicts, the

EPA simply increased the pressure: it got him indicted.

16.   It was not an act hastily taken in panic or fear that Huntress was about to cause devastating harm to the environment; not an emergency effort to stop him from dumping barrels of toxic waste into the Niagra River.

17.   There was indeed no hurry; it was just the next step in an escalating effort to compel obedience. It was a methodical application of its essentially unlimited resources to get what it wanted.

18.   The EPA had actually threatened Huntress with indictment for months before the first indictment was returned, suggesting to him that he could avoid jail by simply kowtowing to the EPA's demands in the Transit Road civil case.

19.   It was just as a Senior Trial Attorney of the DOJ's Environmental Defense Section of the Environmental and Natural Resources Division, stated, in a threatening manner, directly to Bill Huntress on November 29, 2006 – and, subsequently stated on December 9, 2008, to Louis C. Fessard, Acquest's General Counsel: "We have a lot of tools in our box."

20.   Indicting Bill Huntress was simply another tool in the EPA's toolbox.

21.   It was a tool that the EPA thought was appropriate to quiet those who might question the EPA's (unfounded) assertions of jurisdiction – a tool chosen and used in a conscious, deliberate and intentional effort to make an example of Bill Huntress by hitting him as hard as possible.

22.   And the EPA's determination did not even wane after the Court dismissed the first indictment for prosecutorial misconduct; the EPA simply got him indicted again six months later.

23.     Before the EPA finally gave up on its strategy, Bill Huntress and his company had remained

under indictment for 4 years – actually, from start to finish, 4 ½ years, from the Fall of 2011

until the Spring of 2016, with a six month gap in the middle:

- On November 9, 2011, Bill Huntress and Acquest were indicted in the Western District of New York (Case number 1:11-cr-00347) on felony charges of Conspiracy (18 U.S.C. § 371), Obstruction of Justice (18 U.S.C. §§ 1519 and 2), Concealing Material Facts (18 U.S.C. §§ 1001(a)(1) and (2), False Statement (18 U.S.C. §§ 1001(a)(2) and 2), as well as Criminal Contempt (18 U.S.C. §§ 401(3) and 2), and two counts of Unpermitted Filling of Wetlands (33 U.S.C. §§ 1319(c)(2)(A) and 1311(a), and 18 U.S.C. § 2). (Copy attached hereto as Exhibit A.)

  ○    On March 13, 2013, all of those charges were dismissed by the federal court because of prosecutorial misconduct.

- On September 19, 2013, Bill Huntress and Acquest were again indicted in the Western District of New York (Case number 1:13-cr-00199), on felony charges of Conspiracy (18 U.S.C. § 371), Obstruction of Justice (18 U.S.C. §§ 1519 and 2), Concealing Material Facts (18 U.S.C. §§ 1001(a)(1) and (2), False Statement (18 U.S.C. §§ 1001(a)(2) and 2), and Criminal Contempt (18 U.S.C. §§ 401(3) and 2. (Copy attached hereto as Exhibit B.)

  ○    On March 10, 2016, all of those charges were dismissed.

<u>It Was Overkill (Even Had the EPA Possessed Jurisdiction; and Especially Since It Did Not)</u>

24.     It is not surprising that neither indictment contained any allegation that Bill Huntress or Acquest had harmed or were threatening to harm the environment. Not only had no such harm or threat of harm occurred; but protecting the environment was not the focus of the EPA's efforts. What the EPA wanted (and what it got) was somewhat akin to the medieval practice of locking the accused's head and arms in a pilory in the public square. The EPA wanted to send a message – not only to Huntress; but to the public as well – about what happens if you question the EPA.

25.     So the EPA publicly announced that Bill Huntress and his company were felons, thereby destroying his and his company's ability to conduct business, and exposing him to incarceration in a federal penitentiary. In the considered judgment of the EPA, that was all quite acceptable punishment for someone who resists the EPA's assertion of jurisdiction over their private property.

26.     And it was easy. Most of the intended result was automatic, as such results are when our federal government publicly announces that a prominent citizen is a felon. No harm to the environment needed to be proved; no validity to the charges was required; no conviction needed to be obtained. A conviction, and incarceration in a federal penitentiary, would merely have been icing on the cake.

27.     Even a judgment granting the relief sought in this Complaint will not take back the EPA's success, anymore than the dismissal of the felony charges filed against Huntress and Acquest erased the impact of the devastating allegations that were made.

28.     However, what can be done, should be done. The Plaintiffs thus ask this Court to hold the EPA *accountable* for its unlawfully procured success.

<u>Accountability</u>

29.     Accountability is essential to our legal system. Thus, federal agencies should seek to hold accountable those who violate the law. But that is not what the EPA sought to do in this case; and it is not what happened.

30.     Bill Huntress's and Acquest's conduct was not unlawful. Only *the EPA* acted unlawfully, by seeking indictments of Bill Huntress and Acquest to punish them for refusing to accept the EPA's asserted jurisdiction over the Transit Road land (jurisdiction that the EPA actually did not possess).

31.     The unlawfulness of its conduct also evidences the EPA's maliciousness; it demonstrates a belief within the EPA that the EPA can, with impunity, simply ignore the law. The indictments of Huntress and Acquest were the product of intentional decisions to ignore the Supreme Court's *Rapanos* case, the CWA, and the Constitution – just as if none of that law applied to the EPA.

32.     Just as citizens who violate the law should be held accountable, federal regulatory agencies must be held accountable when they harm citizens by acting outside of the law. Accountability for wrongdoing is not, as the EPA believes, a one-way street, to be applied only *by* the EPA, and only *to* its subjects.

33.     Accountability for federal agency wrongdoing lies at the heart of the Congressional decision to waive governmental immunity by enacting the FTCA.

34.  The FTCA is the most effective, existing means to preserve our freedom from fear of our own government – the freedom that perhaps most distinguishes us from the totalitarian regimes of the world. Thus, holding the government accountable for the EPA's abuse of its power is not only important for Bill Huntress, it is important for our country.

35.  What the EPA did to Bill Huntress is shockingly consistent with the EPA enforcement philosophy described by EPA Region 6 Administrator Al Armendariz in 2010 (the year before Bill Huntress was indicted) – a disturbing philosophy that generally thrives only when there is no accountability.

36.  Mr. Armendariz's description of the EPA's enforcement philosophy (at *least* in Region 6) was secretly caught on film and then posted on YouTube. Therein Mr. Armendariz suggests the appropriateness of EPA's use of enforcement tactics similar to that of the Romans' method for securing a compliant populace. He described the Romans' tactic of simply going into a little town, stopping the first five guys they see, and crucifying them. He then noted the obvious result: "And then you know that town was *really easy to manage* for the next few years:"

> "I was in a meeting once and I gave an analogy to my staff about my philosophy of enforcement, and I think it was probably a little crude and maybe not appropriate for the meeting but I'll go ahead and tell you what I said. It was kind of like how the Romans used to conquer little villages in the Mediterranean. They'd go into a little Turkish town somewhere, they'd find the first five guys they saw and they would crucify them. And then you know that town was really easy to manage for the next few years. And so you make examples out of people who are in this case not compliant with the law. Find people who are *not compliant with the law*, and **you hit them as hard as you can and you make examples out of them, and there is a deterrent effect there.**"

www.youtube.com/watch?v=ze3GB_b7Nuo

37.     While Mr. Armendariz did suggest that the Romans' approach be applied to people who are "not compliant with the law," the rub is that the EPA – as it did to Bill Huntress – "makes examples" of people who have not violated any actual "law," but who have merely been "not compliant" with EPA *interpretations* of vague statutes and regulations. In our country, such *interpretations* are not "the law."

38.     By this Complaint Plaintiffs respectfully allege that the EPA's act of "making an example" of Bill Huntress, and "hitting him as hard as possible" – by indicting him, publicly accusing him of being a felon, destroying his ability to conduct his business, and subjecting him to possible incarceration in a federal penitentiary – even though a step down from crucifixion, is a Constitutionally unacceptable means for the EPA to make the populace *"really easy to manage."*

39.     The implementation of that strategy against Bill Huntress and his company constituted unlawful government conduct for which the government should now be held accountable.

XIV.
FIRST CLAIM FOR RELIEF – MALICIOUS PROSECUTION

1.     Plaintiffs incorporate by reference herein all allegations set forth above.

2.     EPA CID agents, together with other officers and agents of the EPA who conspired and acted in concert with those law enforcement agents, acted to procure two indictments of Bill Huntress and Acquest.

3.     Those indictments ended and/or were terminated in the Plaintiffs' favor.

4.     There was no probable cause to commence and/or to continue those criminal proceedings.

5.     The agents and employees of the EPA acted with actual malice in bringing and/or continuing those prosecutions.

6.     These acts and omissions of United States Government employees while acting within the scope of their offices and employment, as set forth above, proximately caused economic damages (lost income) and personal injuries (damages to reputation, emotional distress and mental anguish, humiliation and loss of consortium) emotional anguish and mental distress to Plaintiffs under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the State of New York, in that such negligent and wrongful acts and omissions constitute malicious prosecution by investigative and law enforcement agents of the United States acting within the scope of their employment.

7.     The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. § 2680(h).

XV.
SECOND CLAIM FOR RELIEF – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1.      Plaintiffs incorporate by reference herein all allegations set forth above.

2.     The government conduct described herein was committed by a law enforcement agency of the United States entrusted to enforce the law, and endowed with great resources and power to carry out that public trust.

   a.     The conduct at issue was unlawful, and constituted a violation of that public trust.

   b.     The conduct was intentional, and was perpetrated for more than four years.

   c.     The conduct involved a deliberate disregard for the victims' constitutional rights, by a government entity that possessed the resources to know the law, to fully understand the law, and to ensure that its agents respected and protected the victim's constitutional rights.

d.      The agency failed to utilize its vast resources to train, educate and supervise its agents in order to assure that its agents enforced the law, and did not themselves violate the law.

e.      Numerous agents within the agency on numerous other occasions widely violated the constitutional rights of citizens in a similar manner, and the agency condoned – either officially, and/or tacitly – such conduct on this and other occasions.

f.      The unlawful conduct at the core of this case was directed at a respected, productive and law abiding citizen of the United States, with no prior criminal record, who had not harmed or even threatened to harm the environment or the public.

g.      The unlawful conduct was designed and carried out in an effort to punish the citizen for exercising his lawful right to challenge in Court the government's assertion of jurisdiction over his private property, and to coerce him into abandoning his legal rights to challenge the government in Court.

h.      The punishment was intentionally inflicted, and consisted of falsely and publicly labeling the citizen as a felon, depriving him of his livelihood, and threatening to incarcerate him in a federal penitentiary, merely because he had challenged the EPA's assertion of jurisdiction over his private land.

i.      Given the context in which this governmental conduct occurred, the duration of the unlawful conduct, the means used to inflict the punishment and to implement the coercion, this constituted extreme and outrageous conduct of a nature regarded as intolerable in our country.

3.   The government's agents, acting within the scope of their employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

4.   There was a causal connection between the conduct and the injury.

5.   The conduct proximately caused the victim to suffer severe emotional distress.

6.   The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. § 1346(b)(1).

## XVI.
### THIRD CLAIM FOR RELIEF – ABUSE OF PROCESS

1.   Plaintiffs incorporate by reference herein all allegations set forth above.

2.   The indictments of Bill Huntress and his company were brought in an effort to punish him for his temerity in refusing to accept the EPA's assertions of jurisdiction over his land, and what the EPA considered to be his obstinate defense of the EPA's two civil suits against him, and to gain an advantage over him in those civil cases.

3.   The use of the two indictments for such purposes constitutes an abuse of process, in that it involved:

   a.   Regularly issued criminal process,

   b.   An intent to do harm without lawful excuse or justification, and

   c.   The use of process in a perverted manner to obtain a collateral objective.

4.   The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. § 2680(h).

## XVII.
### CONSPIRACY

1.   Plaintiffs incorporate by reference herein all allegations set forth above.

2.      The two unlawful, and malicious prosecutions of Bill Huntress and Acquest, as set forth above, involved a conspiracy.

3.      The conspiracy involved an agreement between two or more employees of the EPA, including at least one CID agent, and as well as others within the United States Government.

4.      The conspirators committed at least one overt act in furtherance of the conspiracy.

5.      The conspirators intentionally participated in furtherance of the plan and/or purpose of the conspiracy.

6.      The unlawful and unconstitutional acts and omissions of these employees of the United States Government, including the two unlawful indictments of Bill Huntress, while acting within the scope of their offices and employment, as set forth above, proximately caused economic damages (lost income) and personal injuries (damages to reputation, emotional distress and mental anguish, humiliation and loss of consortium) to Plaintiffs under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the State of New York, in that such negligent and wrongful acts and omissions constitute malicious prosecution, abuse of process, and the intentional infliction of emotional distress by investigative and law enforcement agents of the United States acting within the scope of their employment.

7.      The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. § 2680(h).

XVIII.
DAMAGES, AND PRAYER FOR RELIEF

Plaintiffs suffered the following injuries for which they seek full compensation under the law:

a.       Lost income;

b.       Attorney fees;

c.       Costs incurred in defending the criminal prosecution;

d.       Damages to reputation;

e.       Emotional distress and mental anguish, humiliation and loss of consortium;

f.       Costs, as permitted by 28 U.S.C. 1920; and

g.       Such other relief to which Plaintiffs may be entitled.

WHEREFORE, the Plaintiffs are entitled to damages from the United States, and do hereby pray that judgment be entered in their favor and against the United States government in an amount not to exceed $387,629,459, together with all court costs incurred by Plaintiffs in this civil action, together with such further and additional relief at law or in equity that this Court may deem appropriate or proper.

Respectfully submitted,

LUPKIN PLLC

S/ Jonathan D. Lupkin
Jonathan D. Lupkin (JL-0792)
Michael B. Smith (MB-3281)
80 Broad Street, Suite 1301
New York, New York 10004
Tel: (646) 367-2771
Fax: (646) 219-4870
Email: jlupkin@lupkinpllc.com
        msmith@lupkinpllc.com

THE CORNWELL LAW FIRM
Gary T. Cornwell
Texas Bar No. 04837000
900 N. Rainbow Ranch Road
Wimberley, Texas 78676
Tel: (409) 659-7788
Fax: (713) 583-9020
Email: gtcornwell@gmail.com
Petition for Admission Pro Hac Vice forthcoming

G. Robert Blakey
William J. & Dorothy K. O'Neill Professor of Law
Emeritus, Notre Dame Law School
7002 E. San Miguel Ave.
Paradise Valley, AZ 85253
Tel: 574-514-8220
E-mail: Blakey.1@nd.edu
Petition for Admission Pro Hac Vice forthcoming

Lawyers for Plaintiffs